J-S13034-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: C.D.F., A MINOR

APPEAL OF: B.G., MOTHER

:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 85 MDA 2022

Appeal from the Decree Entered December 14, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0207a

IN THE INTEREST OF: C.D.F., A MINOR

APPEAL OF: B.G., MOTHER

:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 102 MDA 2022

Appeal from the Order Entered December 15, 2021
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-147-2016

BEFORE:   STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:      **FILED: MAY 16, 2022**

B.G. ("Mother") appeals from the order and decree entered in the Court

of Common Pleas of York County, which changed the permanency goal from

_____

[*] Former Justice specially assigned to the Superior Court.

reunification to adoption and involuntarily terminated her parental rights to her minor son ("Child").  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On August 26, 2019, the York County Office of Children, Youth, and Families ("the Agency") filed an application for emergency protective custody as to Child on the basis he was without proper care or control. The Agency averred that, on August 26, 2019, it received a referral that Mother, who was on probation, was arrested for loitering and prowling, and she was confined to the York County Prison.

In this same incident, Mother's paramour was charged with driving while under the influence of alcohol, as well as loitering and prowling.  The incident occurred behind Mother's home, and Child was in the home at the time. Since Child's biological father is deceased and maternal grandmother lives in Georgia, the Agency was unable to find any relative resources to care for Child.

By order entered on August 27, 2019, the Orphans' Court found sufficient evidence that the return of Child to the home of Mother was not in Child's best interest and would be contrary to his welfare. Thus, the Orphans' Court transferred legal and physical custody of Child to the Agency, and Child was placed in foster care. The Orphans' Court appointed David Cook, Esquire, as the guardian *ad litem* for Child.

On August 29, 2019, the Orphans' Court conducted a shelter care hearing, at the conclusion of which the Court held that sufficient evidence was

presented to prove that the return of Child to Mother was not in Child's best interest. Thus, the Orphans' Court directed that legal and physical custody of Child would remain with the Agency and Mother would have supervised visitation. The Orphans' Court noted Mother had been released from prison; however, the guardian *ad litem* expressed concern that Mother minimizes her criminal and drug history.

On August 30, 2019, the Agency filed a dependency petition; however, the Agency withdrew the petition without prejudice on September 6, 2019. Legal and physical custody of Child was returned to Mother. The Agency continued to monitor the family and provide services.

On February 21, 2020, the Agency filed an application for emergency protective custody as to Child on the basis he was without proper care or control. The Agency averred that Child has mental health and behavior concerns for which he takes prescribed medicines. The Agency further averred Mother's paramour resides with Mother and Child, and the Agency has concerns about domestic violence, which occurs between Mother and her paramour. The Agency indicated Mother has sustained black eyes and bruises from incidents related to domestic violence, and Child has expressed that he is afraid of Mother's paramour.

The Agency alleged Mother lost her job at the beginning of 2020, Mother's paramour threw away Child's bed, and Mother voluntarily gave guardianship of Child to the prior foster parents in mid-January 2020.

However, the foster parents subsequently expressed an unwillingness to continue to care for Child. Thus, since the Agency was unable to identify any relatives to care for Child, the Agency sought emergency protective custody of Child.

By order entered on February 21, 2020, the Orphans' Court found sufficient evidence that the return of Child to the home of Mother was not in Child's best interest and would be contrary to his welfare. Therefore, the Orphans' Court transferred legal and physical custody of Child to the Agency, and Child was placed in foster care. The Orphans' Court appointed David Cook, Esquire, as the guardian *ad litem* for Child.

On February 24, 2020, the Orphans' Court conducted a shelter care hearing, at the conclusion of which the Court held sufficient evidence was presented to prove that the return of Child to Mother was not in Child's best interest. Thus, the Orphans' Court directed that legal and physical custody of Child would remain with the Agency and Mother would have supervised visitation. The Orphans' Court found Mother was unemployed, searching for housing, and taking Suboxone.

On February 25, 2020, the Agency filed a dependency petition raising similar allegations as were made in the February 21, 2020, application for emergency protective custody. The Agency noted Child had been placed with a new foster family.

On March 3, 2020, the Orphans' Court held a dependency hearing, at the conclusion of which the Court found by clear and convincing evidence that Child is without proper care or control, subsistence, education, or other care or control necessary for his physical, mental, or emotional heath. Thus, the Orphans' Court found Child to be a dependent child.

The Orphans' Court held that, based upon findings of abuse, neglect, or dependency of Child, it is in Child's best interest for him to be removed from Mother's home; however, the Orphans' Court set the goal as return to parent. The Orphans' Court provided several goals for Mother, including parenting capacity assessment, random drug and alcohol testing, in-home team, drug and alcohol counseling, mental health counseling, and summer camp/day care planning.

Following a hearing, on August 4, 2020, the Orphans' Court filed a permanency review order wherein the Court indicated it had consulted with Child, and the views of Child had been ascertained by the guardian *ad litem*.[1] Child expressed he was anxious to return home with Mother. However, the Orphans' Court noted Mother had been minimally compliant with the permanency plan.

On November 9, 2020, Mother petitioned for the appointment of counsel; however, concluding her income exceeded the guideline amount for

---

[1] Child was born in October of 2012, and thus, he was seven years old at the time of this hearing.

court-appointed counsel, the Orphans' Court denied the petition. On May 17, 2021, Mother filed a second petition, and, concluding she met the guideline amounts, the Orphans' Court appointed counsel to represent Mother.

The Orphans' Court held numerous status review and permanency review hearings, and the Court entered orders on November 17, 2020, February 12, 2021, June 8, 2021, and July 27, 2021. In each of these orders, the Orphans' Court determined the placement of Child continued to be necessary and appropriate. In the November 17, 2020, order, the Orphans' Court found Mother moderately compliant with the permanency plan. However, in the subsequent orders, the Orphans' Court found Mother minimally compliant with the permanency plan. The goal continued to be to return Child to Mother. In the July 27, 2021, order, the Orphans' Court directed that the Agency place Child in a residential treatment facility so that he could receive psychiatric care and treatment.

On August 10, 2021, the Agency filed a motion for modification of placement seeking to have Child placed in in-patient hospitalization, and on that same date, the Orphans' Court granted the motion.

On September 27, 2021, the Agency filed a petition for a hearing to change the court-ordered goal from reunification to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365. On September 28, 2021, the Agency filed a petition to involuntarily terminate the parental rights of Mother under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

The Orphan's Court combined the matters and held a two-day hearing (December 9 and 14, 2021) on both petitions. At the hearings, Child was represented by Attorney Cook as the guardian *ad litem*, as well as Carolyn J. Pugh, Esquire, as his legal counsel. Thomas W. Gregory, Jr., Esquire, represented Mother, who was present at the hearings.

Krystyn Wartluft, who is an outpatient therapist and case management supervisor at Pennsylvania Counseling Services-York Psychiatric ("Pennsylvania Counseling"), testified she has a master's degree in addiction and co-occurring disorders. N.T., 12/9/21, at 14. She confirmed Mother is her client, and she conducted an initial drug and alcohol evaluation on Mother in September of 2021. *Id.* at 15.

During the initial evaluation, Ms. Wartluft concluded Mother was a good candidate for the women's trauma group, and Mother began to attend the group on October 7, 2021. *Id.* The group meets once a week for two hours, and Mother attends regularly. *Id.* Ms. Wartluft testified Mother met with her individually once a week, and sometimes twice a week, for forty minutes to an hour. *Id.*

Ms. Wartluft testified she is addressing several issues with Mother, including PTSD, substance abuse, relationship skills, healthy boundaries, time management, coping skills, and co-dependency issues. *Id.* at 16. Ms. Wartluft described Mother as a "group leader" and indicated she has "made quite a bit of progress." *Id.*

Ms. Wartluft admitted that, at the beginning of treatment, Mother underwent a drug and alcohol test, and she tested positive for an unprescribed methamphetamine. *Id.* at 17, 22. Ms. Wartluft indicated Mother shared with her that she had a relapse just prior to starting treatment; however, Mother did not test positive in any subsequent tests given under Ms. Wartluft's direction. *Id.* at 17-18. Ms. Wartluft testified Mother was compliant with her treatment plan and the recommendations made by Pennsylvania Counseling. *Id.* at 19. She admitted she did not "deal with any parenting issues" as it relates to Mother. *Id.* at 20.

Ms. Wartluft clarified Mother began treatment with her "the last week of September[,]" which was near the time the Agency filed its petition for termination on September 28, 2021. *Id.* at 21. Ms. Wartluft admitted Mother was diagnosed with opiate dependency, methamphetamine dependency, cocaine abuse, an anxiety disorder, and depression. *Id.* at 22. Ms. Wartluft indicated she was unaware that, on November 12, 2021, Mother tested positive for amphetamines and alcohol through testing given by Averhealth; however, Ms. Wartluft indicated Mother had a prescription for amphetamines. *Id.* at 23-24. She admitted Mother did not inform her that DUI charges were filed against her in Adams County on August 25, 2021. *Id.* at 25. Ms. Wartluft acknowledged that it was not in Mother's best interest for her to withhold this information. *Id.*

Ms. Wartluft testified Mother disclosed prior to treatment that she had a history of inpatient at Bowling Green in 2016, outpatient treatment at Colonial House in 2016, outpatient treatment at Wellspan in 2018 and 2021, outpatient treatment at TruNorth in 2021, and mental health counseling at Meadowlands in 2020. *Id.* at 27. Ms. Wartluft testified Mother reported she had successfully completed these programs; however, Pennsylvania Counseling did not verify Mother's assertion. *Id.*

Ms. Wartluft testified Mother has been prescribed Adderall, Sublocade, Clonidine, and Prozac. *Id.* at 29. Ms. Wartluft is planning to discontinue Mother's use of Adderall as it could be "dangerous for her recovery." *Id.* at 28.

The Orphans' Court held a discussion with Child in chambers with the attorneys present. Child reported he attends school at Hoffman Homes,[2] and it is "going good." *Id.* at 34. Child indicated he is involved in creative therapy, and he enjoys riding horses. *Id.* He has also taken art and music. *Id.* at 35.

The Orphans' Court asked Child whether, after he leaves Hoffman Homes, he would like to live with a "nice foster family or back with your mom." *Id.* at 36. Child responded he wants to live with Mother because he "love[s] her." *Id.* Child testified he feels safe with Mother, but he does not feel safe

---

[2] Hoffman Homes is a psychiatric residential treatment center for youth.

with her paramour. *Id.* He indicated that, if Mother did not live with her paramour, he would feel "very safe" with Mother. *Id.*

Child admitted there were times when Mother took substances, which made it difficult for her to take care of him. *Id.* at 37. He indicated that, if he could visit with Mother while living with someone else, he would "be fine with that." *Id.* However, he testified it "would be better" if he could live with Mother. *Id.* Child testified he "really love[s] [his] mom and [his] first choice would be to be with her if she was safe." *Id.* at 40.

Katie Bozart, who is a family advocate through Catholic Charities York Intensive Family Services ("Catholic Charities"), testified she assists clients in accomplishing various treatment plan goals, which typically involve parenting issues. *Id.* at 46-47. Catholic Charities opened up services with Mother on December 8, 2020, and Ms. Bozart began working with Mother on December 21, 2020. *Id.* at 47. Ms. Bozart clarified she was part of a team. She and her co-worker, Christianne Brennan, who was a family therapist, worked on Mother's case. *Id.* Ms. Bozart confirmed Catholic Charities stopped involvement with Mother on June 8, 2021, as she was non-compliant with her goals. *Id.*

Ms. Bozart indicated that, on June 3, 2021, there were concerns Mother was under the influence. *Id.* at 48. She noted that, during supervised visitation with Child, Mother appeared to be disoriented, and Child "appeared to be picking up [on the fact] that Mother was not herself." *Id.* Ms. Bozart's

co-worker entered the room, confirmed Ms. Bozart's suspicions, and agreed the visit should be canceled. *Id.*

Ms. Bozart testified that, throughout Mother's involvement with Catholic Charities, Mother was not transparent regarding her drug and alcohol consumption. *Id.* She indicated that, based on Mother's behavior, there were several occasions when she believed Mother was under the influence of alcohol or drugs; however, she could not confirm Mother's use. *Id.* She indicated Mother often told her she was "free of drugs and alcohol;" however, she eventually admitted to using alcohol. *Id.* at 49. Ms. Bozart testified Mother was not compliant with the required Averhealth testing, and when she was compliant, she tested positive for alcohol. *Id.* However, Mother claimed she tested positive because of "her proteins due to a health issue." *Id.* at 61. On this basis, Catholic Charities concluded Mother was not being transparent about her use of drugs and alcohol. *Id.*

Regarding Mother's obligations to attend sessions with the Catholic Charities' team, Ms. Bozart testified Mother was "inconsistent." *Id.* at 50. She testified that, during her involvement with Mother, Mother had "three different jobs." *Id.* Her changes in work directly impacted her schedule and ability to attend sessions, as well as attend scheduled visitation with Child. *Id.* Ms. Bozart indicated the team worked to accommodate the changes by holding some of the visits via Zoom; however, it "ultimately did appear to

impact [Child]." ***Id.*** She noted he became upset by the Zoom visitation and engaged in "escalating behaviors." ***Id.*** at 51.

Ms. Bozart testified that, on May 5, 2021, during a visit Child had with Mother at Mother's home, Mother had a wristwatch, which Child wanted to keep. ***Id.*** When Mother told him that he could not keep it, Child had a tantrum and fled Mother's home. ***Id.*** Ms. Bozart indicated she called the police, and after Child was located, he was taken back to the foster home. ***Id.*** at 52. Ms. Bozart testified that, because of this incident, the "professionals agreed…that visitations were no longer to take place in the community setting or at [M]other's home." ***Id.*** Thus, visits between Mother and Child were thereafter held at the Catholic Charities' offices. ***Id.***

Ms. Bozart indicated Mother had no periods of unsupervised or partially supervised visits with Child. ***Id.*** She noted the impediment to such visitation was Child's behaviors and Mother's inability to manage the behaviors. ***Id.*** Ms. Bozart testified "[t]here were concerns regarding [Mother] having appropriate expectations and use of appropriate discipline." ***Id.*** She indicated Mother "appeared to struggle to follow through regarding those—establishing those expectations and implementation of consequences." ***Id.*** In this regard, Mother tried "to appeal to [Child's] emotions or reward negative behaviors." ***Id.*** She noted Mother's "structure was very lax[,] [a]nd [Child] really needed those specific structures[.]" ***Id.*** at 53.

Ms. Bozart testified there were concerns regarding Child's use of technology, as well as Mother providing Child with the technology. *Id.* She indicated that, at one point, Child's cell phone was removed from his use because he used it to contact Mother and then exhibited poor "behaviors stemming from that." *Id.* at 53-54. After the cell phone was taken from Child, Mother purchased Child an electronic tablet, and the tablet was removed from Child's use because he used it to view pornographic images. *Id.* at 54. He also used the tablet to contact Mother, and he then exhibited poor "behaviors stemming from that[,]" as well as stole the foster family's credit card to purchase games for the tablet. *Id.* at 54-55. Ms. Bozart testified Mother then purchased a television for Child, and this negatively impacted Child's behavior in the foster home. *Id.*

Ms. Bozart testified she and the family therapist had multiple conversations with Mother about not buying gifts for Child; however, Mother continued to do so. *Id.* at 55. She noted Mother continued to bring gifts to Child at every visit. *Id.* at 56. She testified that, when Mother was told about Child's viewing of pornography and unauthorized use of the foster family's credit card, Mother shifted the blame from Child to other individuals. *Id.* at 68. She did not hold Child accountable for his actions, which concerned Ms. Bozart since she had been working on this issue with Mother. *Id.* She also noted there were concerns because Mother would pull Child aside to have "private or secret conversations just between the two of them[.]" *Id.* Despite

being instructed not to engage in this behavior, Mother continued to do so. *Id.*

Ms. Bozart testified she received a report that, on June 1, 2021, Mother appeared unexpectedly at the foster home, and the foster parents alleged Mother had Child urinate in a cup. *Id.* at 57. The next day, on June 2, 2021, Ms. Bozart retrieved Child from school and transported him to her office for a visit with Mother. *Id.* Ms. Bozart testified the following exchange occurred between her and Child:

> So, I did bring up whether or not he had seen [Mother] over the weekend. He did state that he had seen [Mother]. I asked him if there was something regarding a cup that took place. [Child] appeared to become upset and become emotional and he did tell me he wasn't supposed to say anything. And then [Child] did divulge to me that he had peed in a cup for her when [M]other was present at the home. She had shown up there to drop his bike off. And then [Child] appeared to become upset and afraid, stating that he thought something was wrong with him.
>
> He stated that he had been urinating in cups since he was, what he said, baby, so a younger child. And it's something [Mother] makes him do because there is something wrong with him. He didn't know what was wrong with him, but there was something wrong with him and that is why he was made to urinate in a cup so often. He stated to me that he wasn't supposed to tell anyone and that he was told it was a secret. [Child] then was observed by myself becoming mad and upset for telling the secret to me. He then said that he did not want [Mother] getting in any trouble and that we just need to talk about something else.

*Id.* at 57-58.

Ms. Bozart testified Mother was twenty-five minutes late for the June 2, 2021, visit with Child, and Child appeared to be angry at Mother for being late. *Id.* at 58. Ms. Bozart clarified that the bicycle, which Mother dropped off at

the foster home on June 1, 2021, was a "new bike that had been purchased for [Child] by Mother." **Id.** at 59.

Ms. Bozart admitted Child appears to be bonded with Mother. **Id.** However, "there were concerns raised on the level of co-dependency and at times parentified behaviors exhibited by [Child]. [Child] did demonstrate a great love of his mother and would frequently tell her how much he loves her." **Id.** at 59-60. Ms. Bozart opined the bond between Child and Mother was not entirely "healthy[,]" which is why she recommended Mother have therapeutic visits with Child to work on the child-parent bond in a healthy manner. **Id.** at 60.

Ms. Bozart testified that, for six months, she supervised approximately fifty visits between Mother and Child. **Id.** at 62-63. She acknowledged Mother did not miss many of the visits; however, some of the visits needed to be changed to Zoom versus in person to accommodate Mother's schedule. **Id.** at 63. Ms. Bozart reiterated that, during the six months, Mother had three different jobs. **Id.** One of the jobs was in Maryland, which impacted Mother's ability to visit Child. **Id.**

With regard to the issue of co-dependency, Ms. Bozart testified that, during the visits, Child would "escalate" his behavior, and Mother would be unable to properly "de-escalate" the situation. **Id.** at 72. Mother would resort to promises and not hold him accountable. **Id.** She noted Mother appealed to Child's emotions during visits, and Child became extremely upset if anyone

- 15 -

touched any belongings given to him by Mother. *Id.* at 74. Ms. Bozart indicated it made it difficult to hold Child accountable while he was at the foster home since the expectations implemented by the foster family were different than Mother's expectations. *Id.*

Ms. Bozart noted that, when the foster family took the tablet away from Child, he struck people in the household, as well as "acted out aggressively towards one of the pets within the foster home." *Id.* at 75. He had "[m]eltdowns and…engage[d] in some self-injurious behaviors in the form of hitting himself in the head." *Id.* When she spoke to Mother about Child's behaviors, Mother blamed the foster family. *Id.*

Regarding the issue of parentification, Ms. Bozart testified that, although he was quite young, Child was "extremely concerned about his mother and her health and well-being." *Id.* at 76. He would frequently attempt to contact her to "be sure she was okay." *Id.* When Mother was emotional, it would directly impact Child as "he thought he needed to make it better." *Id.* Ms. Bozart opined it was "concerning" that Child felt he needed to undertake the role as caregiver to Mother. *Id.*

Regarding appropriate interaction, Ms. Bozart admitted Child and Mother played board games during their visits. *Id.* at 77. Mother showed Child how to throw a football and basketball. *Id.* Ms. Bozart indicated that, at times, the interaction between Mother and Child was positive during the visits. *Id.* at 78.

Alesha Miller, a therapist at Hoffman Homes, testified Child is one of her clients, and she began working with him on August 10, 2021. *Id.* at 86. She indicated she "sees him every day at the school" in passing, and she has an individual session with him once a week. *Id.* Mother is involved in a one-hour family session every week, and she has not missed any sessions. *Id.* at 86, 93, 99, 100.

Ms. Miller testified that, when she tries to talk to Child about things from the past, he "shuts down" very quickly in "avoidance." *Id.* at 87. She noted he is "a little more open individually but not that much more." *Id.* She indicated Mother does well trying to talk to Child about his past, but Child is not particularly responsive. *Id.* at 88. She testified Mother needs to assist in de-escalating Child's behavior at every visit since Child is "triggered" easily; however, she opined Mother is "very good" at doing this. *Id.* She admitted he does not have "triggering events" in the school or residential setting. *Id.* at 101. Ms. Miller confirmed Child appears to be concerned about Mother; however, in her view, it was appropriate concern. *Id.* at 89.

Ms. Miller opined that, if Child is unable to visit with Mother, it would negatively impact him. *Id.* at 90. She testified they have a bond, and he looks forward to the visits. *Id.* She indicated she believes Child will revert to aggressive behaviors if Child is placed in a new foster home and not placed with Mother. *Id.* at 91. She noted he is doing well in the Hoffman Homes institutionalized setting. *Id.* She admitted that, in the current Hoffman

- 17 -

Homes setting, Mother's ability to manipulate Child is "exceedingly limited" due to the nature of the facility. *Id.* at 103.

Ms. Miller noted she "potentially" has concerns about Mother's substance abuse history. *Id.* at 94. She opined it is "good" that Mother is in therapy and willing to take drug tests. *Id.* She testified that, before Child returns to Mother's home, she would like to see consistency in Mother's sobriety. *Id.* at 95. It makes her "take pause just to make sure…she would be really stable before…reunifying [her with Child] and doing unsupervised visits." *Id.* She admitted she is concerned to learn that Mother relapsed as recently as September of 2021, when she tested positive for methamphetamine. *Id.* at 97-98. She acknowledged Child is aware Mother has drug and alcohol issues, and she opined his knowledge of addiction is "higher" than the typical eight or nine-year-old child due to his exposure to it. *Id.* at 103-04.

Ms. Miller testified that, in Mother's presence, she spoke to Child about the Agency's petition to terminate Mother's parental rights. *Id.* at 98. She indicated he started crying at the idea that he wouldn't see Mother anymore. *Id.* at 99.

Ellie Williams, a therapist, testified she began working with Child on December 3, 2020, and he was referred for individual therapy on a weekly basis. N.T., 12/14/21, at 5. Starting in June of 2021, she supervised two in-person visits with Mother and Child; one visit with Mother, Child, and maternal

grandmother; and two Zoom visits with Mother and Child while Child was in the hospital. *Id.* at 6.

She testified Mother and Child were happy to see each other; however, she admitted there was "some power struggling" between the two during the visits. *Id.* at 7. Ms. Williams indicated she was unable to testify that Mother and Child had "a healthy bond." *Id.* She noted Child has "extreme dysregulation in regards to relationships and connecting with parents or caregivers in general." *Id.* at 8-9. She noted this carried through to visitation with Mother, and he wanted to be in control of the visit. *Id.* at 9.

Ms. Williams testified Child was more focused on demanding items from Mother than on "togetherness." *Id.* She noted she observed Child demand from Mother a Fitbit and money on his debit card. *Id.* at 9-10. He became very angry and argumentative with Mother. *Id.* at 10. Ms. Williams opined Child has a "need to dictate and almost bully mom to get what he wants[.]" *Id.* at 10-11. Ms. Williams testified she instructed Mother to redirect the interaction to spending time together and not about items. *Id.*

Ms. Williams indicated that her involvement with Child was discontinued when Child was moved to inpatient treatment at Hoffman Homes in September of 2021. *Id.* She opined that, if Child is allowed to continue to have a relationship with Mother, he will have an inability to connect in a healthy way with people. *Id.* at 11. She noted Child pushed the boundaries with Mother, and he was unable to do so when clear boundaries were set by foster families.

*Id.* Ms. Williams testified Child suffered developmental trauma, and his level of dysregulation is extreme. *Id.* at 17. She noted that dysregulation is, to some extent, a learned behavior from Mother. *Id.* at 18. She opined that it will be easier for Child to change his behaviors if he is with someone other than Mother with whom those behaviors were developed. *Id.*

Marla Speir, a supervising caseworker with the Agency, testified she was assigned to Child's case on February 25, 2021. *Id.* at 22. She testified Child has been dependent for twenty and one-half months. *Id.* at 23. She confirmed Child's most recent placement was in a residential treatment facility, Hoffman Homes. *Id.* Ms. Speir noted Mother's main issues were drug and alcohol, mental health, and lack of parenting skills. *Id.* at 25. She noted DUI charges were filed against Mother on August 25, 2021, in Adams County for an incident occurring on March 26, 2021, where Mother tested positive for a controlled substance. *Id.* at 26, 68. She also noted Mother has PTSD and depression, which went unaddressed until September of 2021. *Id.* at 69.

Since Child has been adjudicated dependent, Mother has resided at two different addresses. *Id.* at 27. She noted there are no concerns about the inside of Mother's current residence. *Id.* Ms. Speir noted Mother's employment has not been consistent; however, she acknowledged this could be, in part, due to the Covid-19 pandemic. *Id.* at 28. As a general proposition, Mother has been consistent with her visitation with Child. *Id.* Most recently, she has visited in-person once per week and via Zoom once per week while Child has

been at Hoffman Homes. *Id.* at 29. She testified she is not aware of any request by Child to increase visitation with Mother. *Id.*

Ms. Speir testified that, while Child was in foster care, he had unsupervised contact via cell phone with Mother; however, this stopped when he was admitted to Hoffman Homes. *Id.* at 30. She noted the frequency of contact between Child and Mother during the time Child was in foster care was "concerning" because Child used the contact in an inappropriate manner. *Id.* at 31. Child would make blatantly false claims against the foster parents, and Mother would believe the claims without question. *Id.*

Ms. Speir suggested Mother then "stirred up" trouble as it related to Child attempting to settle in at foster homes. *Id.* at 32. One example included when the Agency took Child's cell phone away, and Mother told Child she was not happy with this. *Id.* Ms. Speir clarified Mother argued with the Agency personnel in front of Child regarding the removal of the cell phone, and the result was that Child had "a complete meltdown." *Id.* at 75.

Ms. Speir indicated the foster parents were able to set clear boundaries with Child, and he seemed to respect the boundaries, but Mother was unable to set boundaries. *Id.* at 33. This led to Child demanding "what he wanted" from Mother. *Id.* Prior to Child's placement at Hoffman Homes, there were constant behaviors with Child over the cell phone, television, and bike provided by Mother as gifts. *Id.* at 34. It was "a constant battle with [Child]" as it related to gifts from Mother, so the Orphans' Court filed an order

indicating Mother should not give Child gifts. *Id.* Ms. Speir testified that Child was "obsess[ed] with the gifts and the cards....[I]t was all about what's [Mother] going to bring me[.]" *Id.* at 52.

Ms. Speir testified that, since the adjudication of dependency, several services were deployed for Mother's benefit. *Id.* at 34. For example, Mother was involved with Pressley Ridge Intensive Family Services beginning on October 17, 2019; however, her case was closed on June 24, 2020, due to Mother's lack of attendance and meeting her goals. *Id.* A Pressley Ridge therapist worked with Mother from March 9, 2020, until May 13, 2020. *Id.* at 35. Therapy was discontinued because the therapist had difficulty maintaining communication with Mother. *Id.*

Additionally, Mother was given services through Averhealth, TrueNorth, Pennsylvania Counseling, Philhaven Edgar Square, EquiTeam, and Catholic Charities. *Id.* at 37. Mother was also recommended to attend a parenting capacity evaluation and Suboxone program. *Id.* Ms. Speir testified that, as a result of the parenting capacity evaluation, Mother was recommended to attend weekly psychotherapy, as well as drug and alcohol counseling; however, Mother did not do so. *Id.* at 38.

Ms. Speir testified it is the Agency's opinion that changing the goal from reunification to adoption is in Child's best interest since Child has been in care for "a long time" without Mother making progress. *Id.* at 39. For example, on November 26, 2021, Mother tested positive for cocaine. *Id.* Ms. Speir

indicated Mother is not in a position to obtain physical custody of Child, Mother has not made progress in alleviating the circumstances that necessitated the original placement, and it is not feasible for the goal to be return to a parent. *Id.* at 39-40.

Ms. Speir testified Mother has remained involved with Child. *Id.* at 40. However, she is not in a position to provide for the care, protection, and safety of Child, who has many "issues." *Id.* at 42. Ms. Speir indicated Mother would never focus on Child's needs; but rather, "[M]other only focused on what everyone else was doing incorrectly." *Id.* Ms. Speir admitted that, although "it took a long time," Mother is no longer with her paramour with whom domestic violence was an issue. *Id.* However, she noted Mother's mental health and drug abuse is "a constant concern." *Id.* Mother has not availed herself of the services the Agency has offered in an attempt to have Child returned to Mother's care and custody. *Id.* Because of her efforts to avoid her paramour, Mother was not able to maintain a consistent phone number so that the Agency could contact her. *Id.* at 59-61. However, Ms. Speir admitted she could generally contact Mother via email. *Id.*

Ms. Speir testified Child has extensive mental health issues, including disruptive mood dysregulation and attention deficit/hyperactivity disorder, as well as displaying signs of being on the autism spectrum disorder and having suffered past physical and/or sexual abuse. *Id.* at 44. Ms. Speir testified that, since Mother has been unable to address her own mental health and

substance abuse issues, she has not been in a good position to work on addressing Child's many issues. *Id.*   She noted a pre-adoptive resource has been identified for Child.

Ms. Speir provided the following reasons termination was in Child's best interest:

> [D]ue to the amount of time that [Child] has been in care, he has to have permanency. And even today, we're still dealing with many of the same issues with [Mother].   He has to have permanency because I don't believe he can go on for another year or more waiting and waiting….[Mother] is not in a position to parent [Child], and we need to start identifying a family because we do not want to rush.  Many times, when kids are in foster care and someone gives 30 days' notice, we rush it, but he's at Hoffman Homes, and we can slowly introduce him to a family without making any promises.

*Id.* at 46-47.

She noted that, since the adjudication of dependency, Child has been in seven different foster homes, as well as Hoffman Homes.  *Id.* at 47, 73.  Thus, Ms. Speir testified it was important to slowly introduce Child to his pre-adoptive resource. *Id.* at 48.  She reiterated that "[Mother] is not in a position today [to care for Child], so the Agency feels like we can't continue to wait and wait…to introduce a family or families to [Child]."  *Id.*

Mother testified she has lived alone since November of 2020, when her ex-paramour left the home.  *Id.* at 83.  She noted she lives in a townhouse, and Child would have his own bedroom.  *Id.*  She began working at Harley Davidson the day before her testimony, although she was hired approximately two months earlier. *Id.* at 84. Prior to this job, beginning in the last week of

November of 2021, she worked at EVAPCO, which makes heat exchangers. *Id.* at 85. Prior to this job, beginning in April of 2021, she worked at Canam, which is a steel company based in Maryland. *Id.* at 86. Prior to this job, she worked for Maximus. *Id.* Mother testified she has been employed during the past two years. *Id.* at 87.

Mother indicated she has been in counseling "on and off for almost two years." *Id.* at 90. She admitted she relapsed over the summer in 2021. *Id.* Mother admitted she had a drug and alcohol evaluation in September of 2021, and she tested positive. *Id.* She testified counseling is helping her deal with her mental health and substance abuse issues. *Id.* She admitted she relapsed and tested positive for drugs in November of 2021. *Id.* at 88. She indicated she relapsed because of problems with her family relationships. *Id.* She testified she takes Prozac, Clonidine, Adderall, and Sublocade to address her issues. *Id.* at 89.

Mother admitted her past behaviors have contributed to Child's present behaviors, and she deals with "a lot of guilt and shame for…the stuff that [she] has put him through[.]" *Id.* at 92. She admitted she tried to make up for it by buying him presents. *Id.* She testified that she is working on her own problems so she can take better care of Child. *Id.* Mother testified she would like the chance to show that, since July of 2021, she has been progressing in a positive manner so that she can take care of Child. *Id.* at 93.

Mother admitted that, from the time Child was eighteen months old to three years old, she was not in his life since she was in jail. *Id.* During this time, Child lived with maternal grandmother. *Id.* Also, in 2016, she had other drug offenses, and she was admitted to the Drug Treatment Court. *Id.* at 22. However, she was "unsuccessfully discharged" and spent four months in jail in relation to the charges. *Id.* at 112. She admitted it has been necessary to explain her drug addiction to Child so that he realizes it is not his fault. *Id.* at 94. She also admitted she had DUI-illegal substance-charges pending against her for an incident that occurred in March of 2021, and she did not inform the Agency of the charges. *Id.* at 96, 98.

Mother opined that Child is doing well at Hoffman Homes. *Id.* She acknowledged that, before Child could come home, she needs to set up some type of structure for Child. *Id.* at 96. She noted that, the night before her testimony, she began parenting classes as advised by her case manager. *Id.* at 102.

Mother testified she has three children, all of whom are minors. *Id.* at 97. She admitted none of the children are in her care. *Id.* at 98. She acknowledged she was "defensive" with the Agency and not particularly forthcoming with information. *Id.* at 104. She admitted she did not have regular cooperation with Averhealth testing as was recommended. *Id.* She testified there were times when she forgot to call, and she "could have done better." *Id.* at 105. She admitted she had "positive hits through Averhealth

for alcohol." *Id.* She explained that she drank alcohol but not to excess. *Id.* at 105. She testified that she wishes she could have done things better and different in the past, but she is now focused on changing her behavior. *Id.* at 107.

At the conclusion of Mother's testimony, Attorney Pugh, on behalf of Child, indicated she spoke with Child, and it is clear he is bonded with Mother. *Id.* at 115. She indicated Child "lit up when he talked about Mother[,]" and he told her that Mother is "nice and kind and everything is good about her." *Id.* at 116. She opined that, given Child's age, "it would be difficult for him if termination was granted." *Id.* She indicated Child has indicated he wants to go home with Mother after he leaves Hoffman Homes. *Id.* Ms. Pugh indicated that, "based on her limited knowledge and interaction with [Child]," it is her opinion he will be devastated if he does not go home with Mother. *Id.* at 117. Accordingly, as legal counsel for Child, she indicated she is against termination. *Id.*

Attorney Cook, who was Child's guardian *ad litem*, informed the Orphans' Court that he has "struggled with this case a lot[.]" *Id.* On the one hand, he wants to be able to recommend that Child go home to Mother; however, on the other hand, he recognizes there has been "a lack of progress." *Id.* While he is "optimistic" Mother "can get it right this time," he "can't say [it] for sure[.]" *Id.* He acknowledged Child has issues, and he is not sure that within a reasonable amount of time Mother will get to a point

where she can address and deal with Child's issues. *Id.* He noted Child cares for Mother, and he wants to be with her; however, Attorney Cook expressed concern whether it would be a good situation for Child.

At the conclusion of the hearing, by order dated December 14, 2021, and filed on December 15, 2021, the Orphans' Court directed the goal of return to parent was changed to placement for adoption with the concurrent goal of placement with a legal custodian (non-relative). Mother filed a timely, counseled notice of appeal, as well as a Pa.R.A.P. 1925(b) statement, on January 11, 2022.

Also, at the conclusion of the hearing, by decree entered on December 14, 2021, the Orphans' Court concluded that termination was not proper under Subsection 2511(a)(1). However, the Orphans' Court concluded termination was proper under Subsections 2511(a)(2), (5), (8), and (b), and, thus, the Court involuntarily terminated Mother's parental rights to Child. Mother filed a timely, counseled notice of appeal, as well as a Pa.R.A.P. 1925(b) statement, on January 10, 2022.

On January 25, 2022, the Orphans' Court filed a Pa.R.A.P. 1925(a) opinion. On appeal, this Court *sua sponte* consolidated Mother's appeals.

On appeal, Mother sets forth the following issues in her "Statement of Questions Presented" (verbatim):

1. Did the Lower Court abuse its discretion and err as a matter of law in changing the goal from reunification with a parent to adoption as the Agency failed to meet its burden based upon the evidence and testimony presented?

2. Did the Lower Court abuse its discretion and err as a matter of law as the Agency failed to meet its burden to terminate Mother's parental rights under 23 Pa.C.S.A. Section 2511(a)(2), (5), (8) and 2511(b)?

Mother's Brief at 5 (suggested answers omitted).

For ease of disposition, we begin with Mother's second question on appeal. Mother argues the Agency did not provide clear and convincing evidence in support of termination under 23 Pa.C.S.A. § 2511(a)(2), (5), and (8) or in finding that termination would be in Child's best interest under 23 Pa.C.S.A. § 2511(b).

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013).

"The [orphans'] court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super.

2004) (citation omitted). "[I]f competent evidence supports the [orphans'] court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Subsection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Subsection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Subsection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation omitted).

In the case *sub judice*, the Orphan's Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a), as well

as Subsection 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super.

2004) (*en banc*). Here, we analyze the court's termination decree pursuant

to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to Subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b) (bold in original).

With regard to termination of parental rights pursuant to Subsection

2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and

- 31 -

(3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quotation omitted). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***See id.***

Instantly, in finding grounds for termination of Mother's parental rights, including pursuant to Subsection 2511(a)(2), the Orphans' Court reasoned:

> The Court does find that [Subsection 2511(a)(2)] does apply. Specifically, Mother has not been able to address some of the conditions, specifically her drug use, or made substantial progress with regard to counseling, [such] that she would be able to parent this child right now.
>
> ***
>
> The Court does acknowledge that the petition [to terminate] was filed in September of 2021. While Mother does at this point appear to be serious about addressing some of the underlying concerns, it is also clear that she relapsed at least in September. She has had some continued use of alcohol, and she relapsed again within the past few weeks.
>
> ***
>
> It is also relevant that Ms. Bozart testified Mother appeared to be under the influence of alcohol….As we stand here today, Mother is still not in a position to even have unsupervised contact with the child, let alone to take custody. Furthermore, it is concerning that despite Court order that she was to only have supervised contact, she was engaging in unsupervised contact through electronic means with the child on a frequent basis in violation of that Court order.

- 32 -

She was also completely unaware of appropriate boundaries, triangulation, or splitting such that she was actually condoning, supporting and exacerbating behavior in the foster home on behalf of the child and undermining the child's placement in that home.

While Mother's counseling now is addressing co-dependency, healthy boundaries and healthy relationships, it is notable that Mother at some point described and noted that she needs to put an end to toxic relationships.

N.T., 12/14/21, at 119-20, 122-23.

Moreover, the Orphans' Court indicated:

Here, [Mother] admits to "play[ing] a part in" the Child's trauma he has experienced as a result of her behavior and, namely, her ongoing substance abuse issues. (N.T., 12/14/21, 92). [Mother] also admits to recent relapses in [the] summer [of] 2021, and as recently as November [of] 2021, just weeks before th[e] [Orphans'] Court's hearing on the issue. [*Id.* at] 88-90. [Mother] indicated that she has been in drug and alcohol counseling for a vast majority [of the past year]. While enrolled in drug and alcohol counseling, [Mother] received a DUI charge in March [of] 2021, which is currently pending in Adams County. As such, [Mother] is still struggling with issues related to the substance abuse disorder that substantially contributed to why this Child is dependent. These considerations, as well as other concerning matters on the record, causes the [Orphans'] Court great concern, and, therefore, the [Orphans'] Court must find that [Mother] has failed to remedy the alarming conditions such that she would be able to parent [Child].

Orphans' Court Opinion, filed 1/25/22, at 4.

We find no abuse of discretion or error of law. The record reveals that, while Mother had sporadic improvement, she has been unable to maintain her sobriety. While Child was in a foster home, Mother, without explanation, collected urine from Child. Further, without successfully addressing her own mental health, alcohol use, and substance abuse issues, Mother has been

unable to assist Child with his extensive mental and behavioral issues. Mother's visitation has remained supervised, and she has been unable to progress to unsupervised or partially supervised visitation.

We conclude the Orphans' Court did not abuse its discretion in ordering termination under Subsection 2511(a)(2). The record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. ***See In re Adoption of M.E.P.***, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. ***See id.*** As we discern no abuse of discretion or error of law, we do not disturb the Orphans' Court's findings.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006).

As noted above, in order to affirm a termination of parental rights, we need only agree with the Orphan's Court as to any one Subsection of 2511(a) before assessing the determination under Subsection 2511(b), and we, therefore, need not address any further Subsections of 2511(a). ***In re B.L.W.***, 843 A.2d at 384.

We next determine whether termination was proper under Subsection 2511(b). As to Subsection 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In **In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]**, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], th[e] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

**In re T.S.M.**, 620 Pa. at 628, 71 A.3d at 267 (quotation and citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Subsection 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the [orphans'] court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent....

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quotation marks and quotations omitted).

In determining that termination of Mother's parental rights favors Child's needs and welfare under Subsection 2511(b), the Orphans' Court stated:

> [T]he Court next turns to whether termination would best serve the best interests of the child....[C]learly, dependency has existed in the past and for a period of 20 months[.]...The problem, though, arises because there does appear to be a strong bond between Mother and the child. The problem with a strong bond is that if that bond involves someone who is toxic, the strength of the bond increases the level of toxicity that flows to the child.
>
> In this case, Mother's failure to recognize her co-dependency, her failure to make healthy relationship decisions, her failure to set appropriate boundaries, her failure to follow Court orders with regard to her substance abuse, her drug testing, her mental health, her counseling, her use of gifts involves substantial rationalizations that do not hold up under scrutiny and make her continued contact toxic.
>
> In looking at the opinion of the child, it is clear that he wants to be with his mom, but the Court must also look at the reasoning behind that preference. Notably, when his counsel was stating [her] opinion, he indicated that everything is good about her. We know that not to be true. If he were really seeing mom for who she is and addressing the negatives in his past, which he is not doing, that may affect where he is and what his opinion is at this point.
>
> It is clear that he does not want to be seen as a reason for the termination. He has done everything in his power so that he

would not need to feel guilty about Mother's situation, but that is not his responsibility.

If this were an adult who were involved with someone who had this level of continued relapse, the Court would be saying to this adult, why, why are you in this relationship and exposing yourself to the continued toxicity. It is our job to cut that tie for [Child].

That is even more significant because his very well being in terms of his housing, education, welfare, mental health, exposure to trauma is based on Mother's ability to maintain her sobriety, which she is clearly to date unable to do.

In summary, this child does have a strong bond with his mother. However, that bond is toxic. It is not permitting him to be successful in his foster care placements nor allowing him to move forward to permanency. Therefore, it is clearly in his best interest at this point in time to terminate Mother's parental rights.

N.T., 12/14/21, at 124-26.

Moreover, the Orphans' Court reasoned:

The developmental, physical, and emotional needs and welfare of the child would not be met with [Mother]. It is in the Child's best interest that parental rights of [Mother] be terminated. The Child has been exposed to traumatic events involving substance abuse and domestic violence while in [Mother's] care. Exhibits from Hoffman Homes, where the Child is currently placed, showed disruptive mood dysregulation, attention deficit/hyperactivity disorder, a possible autism spectrum disorder, past physical abuse, past sexual abuse, some sexual acting out including the use of pornography, and self-injurious behavior. (N.T., 12/14/21, 43-33). Mother is in no position to effectively address the Child's needs in these areas. Mother has clearly shown an inability to address her own issues, especially her inability to maintain sobriety, so th[e] Court does not see a way in which she could effectively address the great needs or attention the Child requires. Also, many of the Child's issues are a result of environmental factors from which Mother has failed to protect the Child, and probably herself, while the Child was under her care. She has not shown improvement in understanding protective capacity.

- 37 -

As to the relationship between Mother and the Child, the relationship is toxic. Th[e] Court is greatly concerned about "the **nature** and status of the emotional bond between parent and child." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Although there seems to be a strong bond between Mother and the Child, the bond has reached a toxic level due to Mother's behavior. [Mother] has failed to recognize her co-dependency issues, failed to form healthy relationships, failed to set appropriate boundaries with the Child, failed to follow Court orders with her substance abuse issues, drug testing, mental health, and counseling. Additionally, the Child struggles with demanding gifts, as well as wanting items versus seeking a relationship and togetherness with Mother. On multiple occasions during supervised visits, the Child quickly asked Mother for items, money, or other gifts. When the Child did not receive a response that he wanted, the Child became angry and argumentative. (N.T., 12/14/21, 9-11). Not only did Mother attempt to win the affection of the Child through gifts, she also frequently engaged in unsupervised contact with the Child through electronic means in violation of a Court order.

\*\*\*

The developmental, physical, and emotional needs and welfare of the Child will not be met by Mother given her ongoing extensive personal issues. She has shown very little indication, if any, of improving upon her personal issues that have led to greatly concerning trauma for the Child. Finally, although there is a strong bond between Mother and the Child, the bond is an unhealthy one due to Mother's inappropriate behavior toward the Child and unhealthy rationalizations.

Orphans' Court Opinion, filed 1/25/22, at 7-9 (bold in original).

We conclude the Orphans' Court did not abuse its discretion in finding that Child's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to Subsection 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

To the extent Mother contends the Orphans' Court did not adequately consider the bond between her and Child, we disagree. The Orphans' Court

properly considered in depth the nature and extent of the bond in determining that termination of Mother's parental rights was in Child's best interests. While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Child is entitled to permanency and stability. As we have stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the Orphans' Court properly terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).[3]

Next, Mother argues the Orphans' Court abused its discretion in changing the goal of the dependency proceedings from reunification to adoption. Because we have concluded the Orphans' Court did not abuse its

---

[3] We note that Mother presents challenges to the credibility of various witnesses, as well as the Orphans' Court's factual findings. As indicated *supra*, the Orphans' Court is free to make credibility determinations. *In re M.G.*, *supra*. Further, we conclude competent evidence supports the Orphans' Court's findings, and thus, we must accept the factual findings. *Id.*

discretion in granting the petition to terminate Mother's parental rights, this issue is moot. *In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021) ("[T]he effect of our decision to affirm the orphans' court's termination decree necessary renders moot the dependency court's decision to change the [c]hild's goal to adoption.") (citation omitted)). Accordingly, we affirm the order changing the permanency goal from reunification to adoption.

Even if we were to reach the merits of this issue, we would conclude that no relief is due. The purpose of the Juvenile Act is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S.A. § 6301(b)(1). The Act is additionally intended to "prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." *In re N.C.*, 909 A.2d 818, 823 (Pa.Super. 2006).

> An agency is also not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. However, an agency must redirect its efforts towards placing the child in an adoptive home only after the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed[.]

*In the Interest of T.M.W.*, 232 A.3d 937, 947 (Pa.Super. 2020).

When deciding whether to change the permanency goal in a dependency action, Subsection 6351(f) of the Juvenile Act requires the orphans' court to consider:

> (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

*In Interest of L.T.*, 158 A.3d 1266, 1277 (Pa.Super. 2017) (quotation omitted).

Additionally, a court is required to provide compelling reasons why it is not in the best interest of the child to return to his or her parents and to instead be placed for adoption. *See* 42 Pa.C.S.A. § 6351(f.1)(5)(iv)(C). The child's best interest, safety, permanency and well-being must take precedence over all other considerations in a goal change proceeding. *In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010). The parent's rights are secondary and a goal change to adoption may be appropriate, even under circumstances where a parent substantially complies with a reunification plan. *Id.* A court cannot "subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future." *Id.* (quotation omitted).

In case *sub judice*, there is clear and convincing evidence in the record to support the Orphans' Court conclusion that a change in permanency was in the best interests of Child. The Orphans' Court recounted on the record that Child has been in placement for at least fifteen of the last twenty-two months. Mother has demonstrated an inability to provide a safe environment for Child,

and she has not sufficiently progressed in treating her alcohol, substance use, and mental health issues. There is ample evidence establishing that it was not viable for Child to be reunified with Mother, and that a permanent placement with foster parents would be the best course. Accordingly, the Orphans' Court committed no abuse of discretion in ordering the goal of the dependency proceedings to change from reunification to adoption.

Order and decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/16/2022